IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

SUNDOWNER ASSOCIATION, et al.

                    Plaintiff,

v.                                              CIVIL ACTION NO.   2:14-cv-00193

WOOD COUNTY COMMISSION, et al.,

                    Defendants.


MEMORANDUM OPINION AND ORDER

Pending before the court is Plaintiffs' Motion for Preliminary Injunction [Docket 2]. The

motion is ripe for review, and on May 6, 2014, I conducted a hearing to determine whether to enter

a preliminary injunction. For the reasons set forth below, Plaintiffs' Motion for Preliminary

Injunction [Docket 2] is **DENIED**.

    I.    **Background**

The plaintiffs, Sundowner Gun Club ("Sundowner") and Sundowner's owner and operator,

Kendall Richards, seek to enjoin enforcement of two cease and desist orders issued by the County

Commission of Wood County, West Virginia (the "Commission"). The plaintiffs argue that this

order violates the plaintiffs' due process, Second Amendment, and First Amendment rights. (*See*

Mem. in Supp. of the Mot. for Prelim. Inj. ("Mem. in Supp.") [Docket 3], at 1). The following

facts come from the evidence submitted by both the plaintiffs and the defendants regarding the

motion for preliminary injunction.

Sundowner is a private gun club and shooting range in Wood County, West Virginia. (Am. Compl. [Docket 48] ¶ 1). It is owned and operated by Plaintiff Richards and is "used for firearm training and concealed carry certification." (*Id.* ¶ 17-18). The plaintiffs allege that "[t]he purpose of the Sundowner Gun Club is to provide a safe place for qualified members to practice firearm proficiency and safety, and to use firearms recreationally." (*Id.* ¶ 21). The plaintiffs allege that "[i]n or around Spring 2012, the Wildwood Homeowners Association . . . began a campaign to shut down Plaintiffs' range." (*Id.* ¶ 28). The defendants have presented evidence that beginning in April of 2012, the Wood County Sheriff's Department received several complaints of bullets being found in the residential neighborhood surrounding Sundowner. (*See* Aff. of Jerry Shawn Graham [Docket 10-2] ¶¶ 4-15); Apr. 3, 2012 Call Summary Report WSO12004867 [Docket 10-3]; Apr. 23, 2012 Call Summary Report WSO12005888 [Docket 10-4]; May 25, 2012 Complaint Report WSO12007905 [Docket 10-5]; June 5, 2012 Call Summary Report WSO12008572 [Docket 10-6]; June 26, 2012 Call Summary Report WSO12009809 [Docket 10-9]; June 28, 2012 Call Summary Report WSO12009935 [Docket 10-10]; July 11, 2012 Call Summary Report WSO12010758 [Docket 10-12]; July 23, 2012 Call Summary Report WSO12011482 [Docket 10-13]; July 27, 2012 Call Summary Report PPD12022373 [Docket 10-14]; Aug. 6, 2012 Call Summary Report WSO12012282 [Docket 10-15]; Aug. 13, 2012 Call Summary Report WSO12012767 [Docket 10-17]; June 2, 2013 Call Summary Report WSO13007629 [Docket 10-19]).

Mr. Richards was informed of the complaints when they began in April 2012. (*See* Apr. 3, 2012 Call Summary Report WSO12004867 [Docket 10-3] (stating that the sheriff's office "showed Mr. Richards the recovered round and just wanted him to know the shot might have come

from his range," and that "Mr. Richards advised [the sheriff's office] to have the complainant call him")). After local resident Emily Bradley complained about finding a bullet hole in front of her home on April 23, 2012, she advised the sheriff's office that the Wildwood Homeowners Association ("Wildwood") would be meeting on that date regarding Sundowner because local residents were concerned about their safety. (Apr. 23, 2012 Call Summary Report WSO12005888 [Docket 10-4]). The plaintiffs contend that at this meeting, "the President of Wildwood told the assembled group that he recognized that the range would be protected under West Virginia laws for claims of nuisance related to noise, as the range had operated in that location longer than the statutory exemption provided" and "indicated that they needed to make their complaints about safety." (Compl. [Docket 1] ¶ 39).

On June 21, 2012, the Commission met with Charlie Nelson, a representative of Wildwood, regarding Sundowner. (*See* June 21, 2012 Minutes and Orders [Docket 10-7], at 2). Mr. Nelson attended the meeting

> to request [the County Commission] pass an Ordinance to provide the homeowners some relief from the shooting range located in their area of the County. Mr. Nelson read a list of complaints residents have submitted regarding the range. He asked the County Commission to pass an ordinance regulating private gun ranges in the County.

(*Id.*). At the meeting, the Commission "[a]uthorized the County Administrator to contact the Wood County Prosecuting Attorney to request him to file a nuisance complaint and Order a cease and desist for operations of the Sundowner Gun Range on Gihon Road" and authorized "the County Administrator to contact the Wood County Sheriff's Office regarding" the range (*Id.* at 2, 13). On June 25, 2012, the County Commission held another meeting where Sundowner was discussed. (*See* June 25, 2012 Minutes and Order [Docket 10-8]). Mr. Richards contends that he was informed

3

of the June 25 meeting on June 22, and told the Commission that he could not attend because of a

business engagement he had on June 25. (*See* Am. Compl. [Docket 48] ¶ 33). "Area residents and

[the] attorney for the Sundowner Gun Range were present" at this meeting. (*See* June 25, 2012

Minutes and Order [Docket 10-8], at 1). "Although the Commission passed an Order instructing

the Wood County Prosecutor to file a nuisance complaint and order a cease and desist for

operations of the Sundowner Gun Range, no such complaint or order were issued." (Resp. to Pls.'

Mot. for Prelim. Inj. [Docket 10], at 3).

The plaintiffs allege that at the meeting,

> [a] number of Wildwood residents appeared and made statements intended to bring
> the safety of the range into question. Further, a number of members of the range
> appeared and described their experiences with the safety and quality of the range.
> Mr. Richards explained that there had not been a verified incident of a bullet leaving
> the range, despite the availability of usage logs that could be used to trace bullets
> back to the range. Mr. Richards also explained that Sundowner has operated
> without complaint for many years, that it is certified by the NRA, and that it is
> insured by the NRA.

(Am. Compl. [Docket 48] ¶ 34).

On July 5, 2012, the Commission "met at the Sundowner Gun Range to tour the facility

due to recent complaints from neighbors." (July 5, 2012 Minutes [Docket 10-11], at 2). The

plaintiffs allege that

> [d]uring the inspection, Commissioners were able to view the safety features in
> place at the range and the topography of the land, including the many physical
> barriers between the range property and Wildwood. Following the inspection,
> Plaintiffs added, at the suggestion of the Commissioners, additional backstop
> material, a new "Blue Sky" safety system, and 24-hour video surveillance to the
> gun range. The video surveillance system, when matched with the shooter logs,
> would allow any claimed bullet strike to be fully investigated. Although they were
> invited to do so during the on-site visit, none of the Commissioners inspected any
> of Sundowner's on-site documentation, such as usage logs, certifications, and
> insurance.

(*Id.* ¶ 53).

The Wood County Sheriff's Office continued to receive complaints regarding stray bullets found in the area. (*See* July 11, 2012 Call Summary Report WSO12010758 [Docket 10-12]; July 23, 2012 Call Summary Report WSO12011482 [Docket 10-13]; July 27, 2012 Call Summary Report PPD12022373 [Docket 10-14]; Aug. 6, 2012 Call Summary Report WSO12012282 [Docket 10-15]). On August 13, 2012, the Commission held a meeting. (*See* August 13, 2012 Minutes and Orders [Docket 10-16]). At this meeting, "Charlie Nelson from [Wildwood] met with the Commission to inform them there has been another complaint of a bullet passing by a house in their neighborhood. He asked the Commission to support the Sheriff investigating any such incidents." (*Id.* at 1). The Commission did not issue an order regarding Sundowner at that time. (*See id.*).

On October 23, 2012, the plaintiffs' counsel wrote a letter to Jason A. Wharton, the Commission's attorney, regarding recent events. (*See* Oct. 23, 2012 Letter [Docket 10-18]. In the letter, plaintiffs' counsel stated that based on the requests of County Commissioner Dunn, Mr. Richards "expended several thousand dollars installing a noise reduction system and other additional improvements to his property to attempt to appease some of the concerns raised during the public meetings." (*Id.* at 1). The letter also asserted that:

> On October 19, 2012, despite the clear knowledge that the Sundowner Gun Range was represented by counsel, Commissioner Dunn, apparently acting in his official capacity as County Commissioner, arrived on Mr. Richards' property unannounced and made additional demands regarding his property that would be needed to avoid action by the County Commission. Mr. Dunn's demeanor was disruptive to the auto sales business that Mr. Richards also operates on the property. Furthermore, because Mr. Richards has already expended thousands of dollars based on the informal requests of an individual Commissioner, he is hesitant to expend future funds when resolution is unclear and these informal actions are not subject to any due process protections.

5

(*Id.* at 1-2). The letter requested that all future communications, actions, and future requests for meetings be directed towards the plaintiffs' counsel and not to Mr. Richards. (*See id.* at 2). Also on October 19, Commissioner Dunn left the plaintiffs' attorney a voice message regarding Sundowner and a potential inspection by a representative of the National Rifle Association ("NRA"). (*See* Transcript of Oct. 19, 2012 Telephone Message [Docket 10-18]). The plaintiffs allege that "[o]n October 29, 2012, the Prosecutor Wharton wrote requesting copies of documentation previously made available for inspection to the Commission and actually reviewed by the Sheriff" and "[o]n November 9, 2012, Plaintiffs responded, through counsel, that the requested information had already been made available and reviewed." (Am. Compl. [Docket 48] ¶¶ 389-40). On October 29, 2012, Jason Wharton, the Wood County Prosecuting Attorney, sent a letter to the plaintiffs' counsel. (*See* Oct. 29, 2012 Letter [Docket 14-8]). The letter stated:

> The Wood County Commission has requested that my office contact you regarding an outstanding issue with regard to the Sundowner gun range. The Commission indicates that Mr. Richards has stated publicly that the range is "certified by the NRA.["] The Commission requests that you forward copies of any documents, letters or correspondence verifying that the Sundown[]er Gun Range is certified by the NRA. If no such documents exist, the Commission would request a response indicating the same.

*Id.*

The next action discussed by the parties is a complaint made to the Wood County Sheriff's Office on June 2, 2013. (*See* June 23, 2014 Call Summary Report WSO13007629 [Docket 10-19]). A resident complained that "his gas grill was damaged by a bullet fired from the gun range owned by Kendall Richards." (*Id.* at 1). On August 12, 2013, the Commission addressed a letter to the plaintiffs' attorney regarding the complaints that the Commission had addressed the prior year. (*See* Aug. 12, 2013 Letter [Docket 10-20]). The letter stated, in full:

It has been a year since the Wood County Commission visited Kendall Richards'
shooting range. The concerns expressed by the Wildwood residents were of noise
and safety. Both have been partially addressed with further improvements planned
by Mr. [Richards] and some that were verbally suggested by the Commission.

Improvements may take some time to do. After a year I hope much has been done.
The major need seemed to be heightening the back berm.

We would appreciate a letter indicating what progress has been both made and
planned in addressing the safety and noise concerns of both the Wood County
Commission and the Wildwood community.

(*Id.*). On September 9, 2013,

the County Commission met with Steve Mahaffey, President of the Wildwood
Subdivision, along with several area residents to discuss concerns with the shooting
range in their neighborhood. They requested the Sheriff's Office measure the
earthen backstop and report back to them. They presented several bullets they have
found on their property from the range. Commissioner Couch stated he saw no
problem with the Commission sending a letter to the Sheriff requesting copies of
all incidents they have investigated and also to check on the safety of the range and
to report back to the Commission.

(Sept. 9, 2013 Minutes and Orders [Docket 10-21], at 1-2). Mr. Mahaffey also submitted a letter

to the Commission and a letter to Ken Merritt, the Sheriff of Wood County, on behalf of Wildwood.

(*See id.* at 6, 7). The plaintiffs allege that the only notice they received of this meeting was a

telephone message for the plaintiffs' counsel ten minutes prior to its commencement. (*See* Am.

Compl. [Docket 48] ¶ 43; Sept. 11, 2013 Letter [Docket 10-22], at 1).

Subsequently, on September 11, 2013, the plaintiffs' attorney wrote to Commissioner

Dunn regarding the September 9 meeting and August 12 letter. (*See* Sept. 11, 2013 Letter [Docket

10-22]). According to the September 11 letter, the November 9, 2012 letter had "outlined

Sundowner's voluntary efforts to cooperate with the Commission's many informal requests for

information." (*Id.*). It also "stated that any further requests would need to be supported by

appropriate legal authority compelling my client to continue to expend time and money" on

improvements to Sundowner. (*Id.*). It asserted that to date, no legal authority had been provided, and the Commission had not responded to the November 2012 letter. (*Id.*). The September 11, 2013 letter also stated:

> I have been told by my client that a reporter indicated the Commission may attempt another inspection of the gun range. I am uncertain whether that representation is accurate; as we were unaware that the Commission would be addressing this subject again at a scheduled meeting. In the past, a commission has arrived unannounced and without notice, purporting to act on the Commission's behalf, which was disruptive of my client's other business interests. Please be advised that the Commission and its members do not, at this time, have my client's permission to enter the Sundowner Gun Range property. The Commission was given full access to the property in July 2012. At this point, my client considers additional cooperation without a showing of legal authority to issue such demands, if such demands are going to be made, to be an undue expense and unwarranted under the circumstances. Any attempt to enter the property without a court order or other proper legal authority will be considered unauthorized by the property owner. If the Commission has such authority, please provide it and I will advise my client accordingly.
>
> At this point, Mr. Richards believes that, not only is he operating within the law, he has previously gone above and beyond what is required of him to address the Commission's concerns. It is now his concern that continued attempts at conciliation will be an unending strain on his time and resources, as the proverbial goalposts may shift. As such, similar to the request of the November 2012 letter, he will need to be directed to the legal authority that would compel his actions. I regret that you continue to receive pressure from the Wildwoods Homeowner[']s Association, but Mr. Richards has civil rights that also deserve respect.

(*Id.* at 1-2). The Commission forwarded this letter to Mr. Mahaffey at Wildwood, and requested that Mr. Mahaffey advise the Commission if there was a compromise Wildwood was prepared to make. (*See* Sept. 23, 2013 Letter [Docket 10-23]). Mr. Mahaffey responded on October 1, 2013, asserting that Wildwood was not willing to make a compromise regarding the gun range at that time. (*See* Oct. 1, 2013 Letter [Docket 10-24]). Mr. Mahaffey also inquired whether the Wood County Sheriff's Department had "examine[d] the rifle range earthen barrier to determine its actual height and report[ed] back to the County Commission." (*Id.*). The plaintiffs assert that "[n]o

8

response to the September 11, 2013 letter was received from the Commission." (Am. Compl. [Docket 48] ¶ 45).

On December 10, 2013, the Commission informed the plaintiffs' counsel that the Commission would be having another meeting on December 16, 2013. (*See* Dec. 10, 2013 Email [Docket 14-3]). The email message was sent to the plaintiffs' attorney through a general intake form on the law firm's website, and stated "[a]ssuming you are still representing the Sundowner Gun Range, we would like to advise you of a meeting before the commission requested by the Wildwood Homeowners Assn. It is scheduled for Monday, December 16th, 2013 at 9:30am in room 203 of the Wood County Courthouse. Please acknowledge this e-mail so we know you are aware of the meeting." (*Id.*). At the December 16 meeting, the Commission "met with representatives from Wildwood Homeowner's Association to discuss the Sundowner Gun Range." (Dec. 16, 2013 Minutes and Orders [Docket 10-25], at 2). A thirty-day cease and desist order was issued for the gun range. (*See id.*; First Cease and Desist Order [Docket 10-26]). The order provided that

> pursuant to West Virginia Code 7-1-3kk based upon testimony of the Wood County Sheriff's Department and numerous residents of that area that the Sundowner Gun Range posed a hazard to public health and safety, said Order prohibits the Sundowner Gun Range from continuing operations for a period of thirty days.

(First Cease and Desist Order [Docket 10-26]). It also "directed the Prosecuting Attorney to submit to the County Commission proposed regulations for gun ranges located in Wood County, West Virginia. (*Id.*). It ordered "that the Sundowner Gun Range shall immediately cease operations as a Gun Range for a period of thirty days." (*Id.*). The plaintiffs allege that when Mr. Richards was delivered a copy of the Cease and Desist Order, he "was told, in summary, that if he shoots on his property, he will be arrested and the bail would be set high enough that he would have trouble

9

getting out. Since the Order is silent about punishment, this is the only information Mr. Richards was given regarding failure to comply with the Order." (Am. Compl. [Docket 48] ¶ 51).

On January 13, 2014, the Commission faxed a notice of a meeting for January 16 to the plaintiffs' counsel. (*See* Jan. 13, 2014 Fax Notice [Docket 14-4]). The notice was on Commission letterhead, and stated that the Commission would be meeting on January 16, 2014 at 10:30 a.m. "to discuss a possible extension and or modification of the CEASE AND DESIST ORDER presently in effect" and notified the plaintiffs' counsel that they could appear at the hearing and be heard. (*Id.*). The plaintiffs did not attend the January 16, 2014 meeting. (*See* Am. Compl. [Docket 48] ¶ 60). On January 16, 2014, the Commission issued a second Cease and Desist Order regarding Sundowner. (*See* Second Cease and Desist Order [Docket 10-27]). This modified and extended the cease and desist order "until such time as the Sundowner Gun Range obtains an evaluation from the N.R.A. Range Technical Team Advisors, provides a copy of said evaluation to the Wood County Commission and complies with the recommendations of such evaluation." (*Id.*). It also provided that the Commission would "pay the cost of the evaluation by the N.R.A. Range Technical Team Advisors." (*Id.*).

## II.    Standard of Review

The United States Supreme Court and the United States Court of Appeals for the Fourth Circuit have provided district courts with a precise analytical framework for determining whether to grant a preliminary injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345-47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). First, plaintiffs must make a clear showing that they will likely succeed on the merits. *The Real Truth About Obama, Inc.*, 575 F.3d at 346. Second, plaintiffs

must make a clear showing that they are likely to be irreparably harmed absent preliminary relief. *Id.* Third, plaintiffs must show that the balance of equities tips in their favor. *Id.* Finally, the plaintiffs must show that an injunction is in the public interest. *Id.* All four requirements must be satisfied for a preliminary injunction to be appropriate. *Id.*

### III.    Discussion

At the outset, it should be noted that the motion for preliminary Injunction and supporting memorandum are sparse and do not articulate that the plaintiffs will succeed on the merits of their claims, which is itself enough to deny the motion for preliminary injunction. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972) (stating that "if the facts [in support of the motion for preliminary injunction] consist largely of general assertions which are substantially controverted by counter-affidavits, a court should not grant such relief unless the moving party makes a further showing sufficient to demonstrate that he will probably succeed on the merits"); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2949, at 238 (3d ed. 2013) ("Preliminary injunctions frequently are denied if the affidavits are too vague or conclusory to demonstrate a clear right to relief under Rule 65."). However, in the interests of justice, I requested supplemental briefing and held an evidentiary hearing on the motion for preliminary injunction, and I will address the merits of the plaintiffs' arguments.

It should also be noted that this ruling should not be construed as approval of the defendants' actions. The plaintiffs have presented evidence indicating that the defendants' decision was not based on a thorough and prudent investigation. However, as I reminded the parties at the hearing, my job is not to act as an appellate court for the Commission's decision. Rather, my job is to determine whether the plaintiffs have demonstrated a likelihood of success on their claims

11

that the order violates their second amendment, first amendment, and fourteenth amendment rights. Because I find that they have not, their motion is **DENIED**.

### A.  The Orders Do Not Implicate the Plaintiffs' Constitutional Rights

First, the cease and desist orders themselves do not implicate the plaintiffs' constitutional rights. The orders were directed towards "Sundowner Gun Range." Sundowner is an unincorporated association. (*See* Am. Compl. [Docket 48]). Unincorporated associations have no legal existence distinct from that of their members. *See e.g., Krumbine v. Lebanon County Tax Claim Bureau*, 663 A.2d 158, 160 (Pa. 1995) ("[A]n unincorporated association is not a legal entity; it has no legal existence separate and apart from that of its individual members.") (citation omitted); *Shortlidge v. Gutoski*, 484 A.2d 1083, 1085 (N.H. 1984) ("A voluntary association . . . has no legal existence apart from the members who compose it.") (internal citations omitted). Therefore, Sundowner itself has no constitutional rights.

Plaintiff Richards argues that his constitutional rights have been implicated because he was told that he cannot shoot on his own property. However, the cease and desist orders do not state that Mr. Richards cannot shoot on his property; they merely say that Sundowner must cease operation as a gun range. And the deputy who allegedly told Mr. Richards that he would be arrested and have an extremely high bail set if he were to shoot on the property is not a party to this action. Therefore, Mr. Richards, who is the only named plaintiff with constitutional rights, has not shown that his constitutional rights were infringed upon by the defendants. The plaintiffs' arguments are better made in state court in a petition for a writ of certiorari or a writ of prohibition. Nonetheless, to avoid confusion and to aid the parties in coming to what I hope will be a successful resolution of these issues, I will address the plaintiffs' constitutional arguments below.

### B.  Second Amendment

The plaintiffs allege that the cease and desist orders violate their Second Amendment rights, and that a strict scrutiny standard should be applied to their Second Amendment claim. This area of constitutional law is not well-settled, and a brief review of Second Amendment law is necessary to fully understand the plaintiffs' allegations.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court

> held, based on the historical background of the Second Amendment, that the Amendment guarantees the pre-existing individual right to possess and carry weapons in case of confrontation. Because the right predated the Constitution, the Court looked to the historical record when articulating its nature, noting that the right was secured to individuals according to libertarian political principles, not as members of a fighting force, to protect against both public and private violence. It also observed that throughout the country's history, Americans have valued the right not only to be able to prevent the elimination of militia, but even more importantly, for self-defense and hunting.

*United States v. Masciandaro*, 638 F.3d 458, 466 (4th Cir. 2011) (internal citations omitted); *see Heller*, 554 U.S. at 591. The Fourth Circuit has noted that following *Heller*, "a considerable degree of uncertainty remains as to the scope of that right beyond the home and the standards for determining whether and how the right can be burdened by governmental regulation." *Id.* at 467. The Fourth Circuit has instructed district courts to use a two-step approach when dealing with a Second Amendment issue:

> The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope

13

of the Second Amendment as historically understood, then we move to the second
step of applying an appropriate form of means-end scrutiny.

*United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). In *Heller*, the Supreme Court
"expressly avoided deciding what level of scrutiny should be applied when reviewing a law
burdening the right to keep and bear arms[.]" *Id.* at 469; *see also Heller*, 554 U.S. at 634-35. The
Fourth Circuit has found that "[w]hile . . . the application of strict scrutiny [is] important to protect
the core right of the self-defense of a law-abiding citizen in his home . . . a lesser showing is
necessary with respect to laws that burden the right to keep and bear arms outside of the home."
*Masciandaro*, 638 F.3d at 471. Therefore, the Fourth Circuit has applied intermediate scrutiny to
cases addressing the right to bear arms outside of the home. *See id.*; *United States v. Chapman*,
666 F.3d 220, 226 (4th Cir. 2012).

The Fourth Circuit has not determined whether operating a private gun range is conduct
falling within the scope of the Second Amendment. The only United States Court of Appeals to
address this issue was the Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).
In *Ezell*, the court addressed a challenge to the City of Chicago's prohibition on all shooting ranges.
*See* 651 F.3d at 691. The court found that shooting ranges were protected by the Second
Amendment because "[t]he right to possess firearms for protection implies a corresponding right
to acquire and maintain proficiency in their use; the core right wouldn't mean much without the
training and practice that make it effective." *Id.* at 704. The court claimed that "several passages
in *Heller* support" this proposition, and noted that,

> [e]xamining post-Civil War legal commentaries to confirm the founding-era
> "individual right" understanding of the Second Amendment, the Court quoted at
> length from the "massively popular 1868 Treatise on Constitutional Limitations"
> by judge and professor Thomas Cooley: "To bear arms implies something more
> than the mere keeping; it implies the learning to handle and use them . . . ; it implies

14

the right to meet for voluntary discipline in arms, observing in doing so the laws of public order."

*Id.* (quoting *Heller*, 554 U.S. at 616). It should also be noted that the municipal ordinance at issue in *Ezell* both banned all shooting ranges within the city, but at the same time required each applicant for a firearm permit to have completed at least one hour of training at a range. *See id.* at 691.

The Seventh Circuit's reasoning seems to begin with the proposition that the right to bear arms for protection means there is also a right to acquire and maintain proficiency. *See Ezell*, 651 F.3d at 704. This reasoning is flawed and also seems to ignore early law limiting where firearms could be discharged. *See generally* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) (examining the history of laws limiting the possession or use of arms outside the home). And although *Ezell* is persuasive authority, I am not bound by the Seventh Circuit's interpretation of Second Amendment rights.

The Fourth Circuit has stated that "[g]iven *Heller's* focus on 'core' Second Amendment conduct and the Court's frequent references to First Amendment doctrine, [they] agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment." *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010). Using the First Amendment as an analog, each citizen generally has the right to speak regarding public issues. This does not mean that each citizen has a corresponding right to maintain a school teaching people how to speak properly, regardless of safety or zoning issues. In this case, the plaintiffs argue that they should not be subject to the safety standards imposed by the Commission. The Second Amendment does not require that there can be no restrictions whatsoever on the use of firearms.

15

Indeed, the Court in *Heller* noted that the decision should not be "taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms[,]"which it deemed "presumptively lawful regulatory measures." 554 U.S. at 626-27, 627 n.26; *see also United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (finding that the Second Amendment was not implicated by criminal statute regarding the sale of firearms and noting that the appellant "has not pointed this court to any authority, and we have found none, that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm. Indeed, although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm"). The right to bear arms does not necessarily imply a wide variety of other rights related to the use of arms.

I am therefore not convinced that the Second Amendment extends to the right to operate a gun range. However, I need not decide that issue today, because even if the cease and desist orders implicate the Second Amendment, they are nonetheless constitutional. The Fourth Circuit has found that intermediate scrutiny applies to "laws that burden the right to keep and bear arms outside of the home." *Masciandaro*, 638 F.3d at 471. This is because "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Id.* at 470. The cease and desist orders therefore satisfy intermediate scrutiny "if the government can demonstrate that [they are] reasonably adapted to a substantial government interest." *Id.* at 471.

16

The government has satisfied their burden in this case. A compelling governmental interest (even more important than a substantial interest) is at stake here—public safety. *See id.* at 473; *Salerno*, 481 U.S. at 745. The government has also demonstrated that its actions were reasonably adapted to the interest of public safety. The Commission took action only after approximately twenty months of complaints from nearby residents regarding bullets leaving the Sundowner range. The cease and desist orders were also limited in duration. The First Cease and Desist Order was only issued for thirty days, and the Second Cease and Desist Order is in place only "until such time as the Sundowner Gun Range obtains an evaluation from the N.R.A. Range Technical Team Advisors, provides a copy of said evaluation to the Wood County Commission and complies with the recommendations of such evaluation." (Second Cease and Desist Order [Docket 10-27]). The Commission additionally agreed to pay for the cost of the evaluation. (*See id.*). Particularly given the plaintiffs' assertions that the range is safe (*see, e.g.*, Reply on Pls.' Mot. for Prelim. Inj. ("Reply") [Docket 14], at 15-16), the burden on the plaintiffs is small. This demonstrates that the Commission reasonably adapted its actions to its interest in public safety. I therefore **FIND** that the plaintiffs have not demonstrated that they are likely to succeed on their Second Amendment challenge. Because I find that the plaintiffs do not demonstrate a likely success on the merits, I need not address the remainder of the factors involved in deciding a motion for preliminary injunction. *See The Real Truth About Obama, Inc.*, 575 F.3d at 346.

## C. First Amendment

The plaintiffs also argue that the Cease and Desist Orders infringe upon their First Amendment rights. The plaintiffs allege that "[t]he mere act of collectively and openly training in the use of firearms is enough [to implicate the First Amendment] because that act reflects a political

17

position and policy preference on the sensitive subject of gun ownership that will be understood by all who see it." (Supplemental Mem. in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Supp. Mem.") [Docket 24], at 13). They also argue that the plaintiffs engage in gun training activities that constitute expressive speech. The plaintiffs have presented no evidence that the defendants intended to limit the plaintiffs' expression by issuing the orders.

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court has] asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Here, the plaintiffs argue that Mr. Richards's intention was to convey a particular message. They argue that this is based on Mr. Richards's belief "in obtaining proficiency with firearms and their recreational use," and state that "[t]he fact that public policy values are implicated in the operation of the range is not a lucky side effect, but is in fact fully intentional[.]" (Pls.' Supp. Mem. [Docket 24], at 13). They also argue that this is a content-based restriction that should receive a strict scrutiny analysis.

I am not convinced that the plaintiffs' operation of a gun range is expressive speech. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Furthermore, the plaintiffs have not pointed to any cases holding that the operation of a business constitutes expressive speech. However, even if the First Amendment is implicated, the cease and desist orders are nonetheless constitutional. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify

18

incidental limitations on First Amendment freedoms." *Id.*

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377. The cease and desist orders satisfy the *O'Brien* test. For the reasons discussed above, it was within the power of the government to issue the orders, the orders further the substantial government interest of public safety, and the orders are unrelated to the incidental restriction on the plaintiffs' First Amendment freedoms. I therefore **FIND** that the plaintiffs have not demonstrated a likelihood of success on their First Amendment claim.

### D.  Due Process

The plaintiffs argue that the Cease and Desist Orders violate the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. "Due process contains both substantive and procedural components. Procedural due process prevents mistaken or unjust deprivation, while substantive due process prohibits certain actions regardless of procedural fairness." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014) (citing *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990); *Carey v. Piphus*, 435 U.S. 247, 259 (1978)). The plaintiffs argue that both their procedural due process and substantive due process rights were violated.

### 1.  Procedural Due Process: Facial Challenge

The plaintiffs argue that West Virginia Code § 7-1-3kk is unconstitutional on its face. West Virginia Code § 7-1-3kk provides that:

> In addition to all other powers and duties now conferred by law upon county commissions, commissions are hereby authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance. The ordinances may provide for a misdemeanor penalty for its violation. The ordinances may further be applicable to the county in its entirety or to any portion of the county as considered appropriate by the county commission.

The plaintiffs argue that the statute is unconstitutional because it does not provide for any pre-deprivation notice or hearing and it does not allow any post-deprivation right of appeal.

In order to succeed on a facial challenge to a law, "the challenger must establish that *no set of circumstances exists* under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added); *see also United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012) ("Under the well recognized standard for assessing a facial challenge to the constitutionality of a statute, the Supreme Court has long declared that a statute cannot be held unconstitutional if it has constitutional application."). In this case, the plaintiffs have not demonstrated that there is no set of circumstances under which Section 7-1-3kk would be valid. The plaintiffs' argument focuses on the fact that Section 7-1-3kk does not set forth the specific post-deprivation and pre-deprivation remedies that a county must follow. However, this does not mean that there is *no* context in which a county could constitutionally apply the statute. A county issuing ordinances or orders under the power of Section 7-1-3kk could easily comply with the procedural requirements of the Fourteenth Amendment by providing proper notice and hearing, and counties frequently do so. The statute need not lay out specific processes in order for the statute to have some constitutional application.

Furthermore, despite the plaintiffs' arguments to the contrary, the West Virginia Code does provide a post-deprivation remedy: a writ of certiorari to the local circuit court. *See* W. Va. Code

§ 53-3-2 ("[I]n every case, matter or proceeding before a county court . . . , the record or proceeding may, after a judgment or final order therein, or after any judgment or order therein abridging the freedom of a person, be removed by a writ of certiorari to the circuit court of the county in which such judgment was rendered, or order made[.]"); *See Lipscomb v. Tucker Cnty. Comm'n*, 475 S.E.2d 84, 89 (W. Va. 1996) (finding that W. Va. Code § 53-3-2 applied and a writ of certiorari was appropriate where the county enabling statute was silent as to the appeals process). The plaintiffs may also request a writ of prohibition if they believe the Commission exceeded its power in issuing the orders. *See* W. Va. Code. § 53-1-1 ("The writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers.").

I therefore **FIND** that the plaintiffs have not demonstrated a likelihood of success on the merits with regard to their facial procedural due process claim.

## 2.  Procedural Due Process: As-Applied Challenge

The plaintiffs also argue that Section 7-1-3kk and the Cease and Desist Orders are unconstitutional as applied to them. "When the power of the government is to be used against an individual, there is a right to a fair procedure to determine the basis for, and legality of, such action." 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 17.1 (4th ed. 2008). "If life, liberty or property is at stake, the individual has a right to a fair procedure. The question then focuses on the nature of the 'process' that is 'due.'" *Id.* at 3-4.

> The due process clauses apply only if a government action will constitute the impairment of some individual's life, liberty or property. Where government actions adversely affect an individual but do not constitute a denial of that

individual's life, liberty or property, the government does not have to give the person any hearing or process whatsoever.

*Id.* § 17.2; *see also Gardner v. City of Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992). "[T]he Fourteenth Amendment itself does not create property interests. 'Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Gardner*, 969 F.2d at 68 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Therefore, in order to prevail on a claim for substantive due process, the plaintiffs must demonstrate that (1) they have a protected property or liberty interest (2) of which the defendants denied them (3) without due process of law. *See Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 826 (4th Cir. 1995); *see also Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (stating that in order "to sustain an action for deprivation of property without due process of law, a plaintiff must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process") (internal quotations and emphasis omitted).

The plaintiffs did not address in the initial briefing what vested liberty or property right under the Fourteenth Amendment was affected by the cease and desist orders. However, in the supplemental briefing, the plaintiffs argue that state law preserves "the unfettered right to use private land for the purpose of a gun range . . . because nuisance actions against established ranges are prohibited and shooting is allowed on private land." (Pls.' Supp. Mem. [Docket 24], at 8). The plaintiffs also argue that their First and Second Amendment rights are protected liberty rights and that they have "[t]he right to lawfully operate a business without arbitrary or undue interference[.]" (*Id.* at 9).

22

The plaintiffs' argument that they have a property right under the Fourteenth Amendment to operate a business is without merit. Private property can constitutionally be subject to a variety of regulations and restrictions. *See, e.g.*, *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926). The Supreme Court has found that individuals do not have a property right under the Fourteenth Amendment to operate a business, or operate a business at a particular location.

> The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment. But business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense.

*Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (emphasis in original).

However, even assuming that the plaintiffs' First or Second Amendment rights are implicated by the orders, which the court does not, the plaintiffs nonetheless have not demonstrated that their procedural due process rights were infringed upon. In order "to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state." *Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990) (citing *Zinermon v. Burch*, 494 U.S. 113, 124 (1990)).

> At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard. Notice and the hearing are two distinct features of due process, and are thus governed by different standards. Proper notice is an elementary and fundamental requirement of due process, and must be reasonably calculated to convey information concerning a deprivation.

*Snider Int'l Corp.*, 739 F.3d at 146 (internal citations omitted).

> A procedural due process violation arises not upon the occurrence of a deprivation but rather the failure of due process in connection with the deprivation. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. Rather than a meticulous examination of the minutiae of the state's procedural

rubric, procedural due process is simply a guarantee that there is notice and an opportunity to be heard.

*Id.* at 149 (internal quotations omitted).

The plaintiffs argue that the notice given to them by the Commission was inadequate. It is undisputed that the plaintiffs received actual notice of the Commission's December 16 hearing; however, the plaintiffs contest whether this notice was constitutionally sufficient. The plaintiffs argue that notice of the December 16, 2013 meeting was inadequate because the plaintiffs were not informed that a cease and desist order may be issued at the meeting. (Reply [Docket 14], at 7).

"Notice must not be a mere gesture, but rather an effort reasonably calculated to effect actual notice." *Id.* at 146. "[N]otice satisfies due process where it either 1) 'is in itself reasonably certain to inform those affected' or 2) 'where conditions do not reasonably permit such notice, the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.'" *Id.* at 146 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)). In this case, the plaintiffs' attorney received a notice on December 11, 2013 that the Commission was having a meeting on December 16. (*See* Compl. [Docket 1] ¶ 52). The email message advised the plaintiffs' counsel that Wildwood had requested a meeting with the Commission, and that the meeting would be taking place on Monday, December 16, 2013, at 9:30 a.m., in Room 203 of the Wood County Courthouse. (*See* Dec. 10, 2013 Email [Docket 14-3]). It also requested that the plaintiffs' counsel acknowledge receipt of the email so the Commission would know the plaintiffs were aware of the meeting. (*See id.*). As the plaintiffs note, it is strange that this notice was given through a general intake form on the law firm's website when the parties had already been in touch for over a year; however, it is undisputed that the plaintiffs were aware of the meeting before it took place. (*See* Am. Compl. [Docket 48] ¶ 47). The plaintiffs' argue that

24

this meeting was different than the prior meetings and therefore additional notice should have been given. Nevertheless, the plaintiffs had been on notice since the first Commission meeting that the safety of the range was being investigated. In the Amended Complaint, the plaintiffs indicate that the Commission "began a campaign to shut down Plaintiffs' range" in the spring of 2012. (*Id.* ¶ 37). It cannot be said that the plaintiffs were not aware that the issuance of a cease and desist order was a possibility.

The plaintiffs also allege that the hearing they received was too informal to pass constitutional muster. They argue that even if they "had attended the December 16 meeting, their opportunity to be heard would not have been sufficient" because "[t]he meeting minutes and news reports of what transpired at the meeting indicate the meeting was conducted in the usual, informal manner." (Reply [Docket 14], at 10).

> Due process, at a minimum, requires that a person be given notice of impending action and afforded a hearing. The nature of the notice and the quality of the hearing are determined by the competing interests involved. Thus, when the property interest that is subject to the deprivation is of minor value, fairness requires a less formal hearing. A more formal hearing would be expected when a significant property interest, one raising the possibility of a grievous or serious loss, is impacted.

*Richardson v. Town of Eastover*, 922 F.2d 1152, 1159 (4th Cir. 1991) (internal citations omitted).

The factors to consider regarding whether a notice and hearing are sufficient include:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In *Richardson v. Town of Eastover*, the Fourth Circuit considered whether the notice and procedure of a town council meeting were sufficient. *See generally* 922 F.2d 1152 (1991). In that case, the town council and mayor of Eastover, South Carolina, had decided not to renew the licenses of nightclubs located on Main Street in Eastover when they came up for renewal. *See id.* at 1155. The city had received complaints about the safety of the nightclubs. *See id.* In April 1988, the city refused to renew the license of Mr. Richardson, a nightclub owner. *See id.* After Richardson complained to the mayor about the non-renewal, he was told to attend the next town council meeting on May 2, 1988 and that he could continue to operate his nightclub until further notice. *See id.* Richardson attended the next two town council meetings, and at the April meeting he presented his views to the council. *See id.* In July, the council officially voted not to permit any nightclubs to operate on Main Street. *See id.* Using the factors laid out in *Matthews*, the Fourth Circuit determined that the notice to Richardson was sufficient. *See id.* at 1160-61. The court noted that "due process . . . requires only fundamental fairness of procedure in the context of the circumstances." *Id.* at 1160. It also stated:

> On the issue of a hearing, due process does not require that in every instance of a deprivation of property, however insignificant, a full-blown evidentiary hearing must be conducted before an impartial tribunal. A hearing need only be provided at a meaningful time and in a meaningful manner in the context of all the circumstances.

*Id.*

The court then found that each of the *Matthews* factors weighed in favor of the town council. *See id.* at 1160-61. The court found that although the property owner "may have had a property interest at stake, . . . the risk that the procedures used could result in an erroneous deprivation of his interest was minimal." *Id.* at 1160. It also found that "the probable value of a

26

more formal hearing [could] not be supported." *Id.* Finally, it found that the government had a legitimate interest in its attempt to "clean up" Main Street and "was properly reacting to complaints of shootings, drug use, fights, and noise." *Id.* at 1161. It dismissed Richardson's argument that the mayor may have decided to close the clubs on Main Street before the town council vote, because the town council's decision was "entitled to a 'presumption of honesty.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

The Fourth Circuit's analysis in *Richardson* is applicable here. The risk that the procedures the Commission used could result in an erroneous deprivation of the plaintiffs' rights was minimal. The plaintiffs argue that the notice was improper because the Commission's investigation of the gun range lasted for approximately a year and a half. However, the fact that the investigation lasted approximately twenty months indicates that the Commission gave serious consideration to the rights of the plaintiffs and the complaints of the nearby residents. Beginning in April 2012, the Sheriff's Department received at least twelve complaints of people nearby finding bullets or bullet holes on their property. (*See* Section I, *supra*). Despite the plaintiffs' assertions to the contrary, it was not necessary for the Commission to find beyond a reasonable doubt that the bullets had come from Sundowner. Rather, the plaintiffs were given notice of several Commission meetings where Sundowner was discussed, and were given the opportunity to present evidence of the range's safety. Additionally, the Commission was not required to give the plaintiffs notice that the December 16 meeting "would be different" from other meetings. Due process only requires that the government give notice that is fair and reasonable under the circumstances. *See Richardson*, 922 F.2d at 1160. The plaintiffs were given many opportunities to present their arguments at every Commission meeting they had notice of.

27

Furthermore, the plaintiffs have not shown that a more formal hearing would have been valuable. First, the plaintiffs were admittedly aware of the Commission meeting and did not attempt to present evidence of Sundowner's safety at the meeting. Second, the plaintiffs have not identified any evidence that they would have presented at a more formal hearing. Third, the plaintiffs were indisputably given sufficient notice of the January 16 hearing and did not present any evidence at it. The January 16 Cease and Desist Order is the order which is currently in place.

The third factor—the government's interest and the additional burdens of a more formal process—also weighs against the plaintiffs. The Commission has a compelling interest in keeping county residents safe. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). The plaintiffs have not suggested any additional notification procedures that the Commission should have followed. Moreover, the Commission discussed the gun range at many meetings over the course of twenty months, and gave the plaintiffs notice of these meetings. The plaintiffs argue that the Commission should not have met on a Monday because Mr. Richards had other business engagements; however, due process does not require that the government plan its hearings around the schedules of those who wish to be heard. As in *Richardson,* the plaintiffs have not demonstrated "that a more formal hearing was required or would have been useful." 922 F.2d at 1161.

Finally, the plaintiffs argue that there was no post-deprivation process provided by the Cease and Desist Order. The plaintiffs are incorrect. As discussed in Section III.C.1, *supra*, the plaintiffs could have filed for a writ of certiorari or a writ of prohibition with the appropriate circuit court and did not do so.

Based upon the foregoing, I **FIND** that the plaintiffs have not demonstrated that they are likely to succeed on their procedural due process claim.

28

### 3.  Substantive Due Process

The plaintiffs also argue that the Cease and Desist Orders violate the plaintiffs' substantive due process because they were "constitutionally arbitrary." (Reply [Docket 14], at 14). In order to succeed on a substantive due process claim, the plaintiffs must "demonstrate (1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 827 (4th Cir. 1995). "The protection of substantive due process is indeed narrow and covers only state action which is so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Id.* (internal quotations omitted). "In short, the doctrine of substantive due process is a constitutionally imposed limitation which is intended only to prevent government from abusing its power, or employing it as an instrument of oppression." *Id.* at 828.

Again assuming the plaintiffs have demonstrated that a protected liberty or property interest was violated, neither of the Cease and Desist Orders issued by the Commission are so arbitrary and outrageous that they are protected by the doctrine of substantive due process. Many of the plaintiffs' arguments relate to the credibility determinations the Commission made throughout its investigation of Sundowner and the process the Commission underwent before issuing the cease and desist orders. (*See* Reply [Docket 14], at 14-18). None of these arguments demonstrate an issue of unconstitutional irrationality or arbitrariness. "Irrationality and arbitrariness imply a most stringent standard against which state action is to be measured in

29

assessing a substantive due process claim." *Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 281 (4th Cir. 1991); *see also Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995) ("A violation of 'substantive' due process occurs only where the government's actions in depriving a person of life, liberty, or property are so unjust that no amount of fair procedure can rectify them.").

Although the plaintiffs have presented evidence that the Commission was biased against him, he did not present evidence that raised the Commission's actions to an unconstitutional level. None of the evidence presented demonstrates that the cease and desist orders were issued so irrationally or arbitrarily as to fall under the purview of substantive due process. Indeed, as the plaintiffs note, the Commission undertook a year and a half long investigation into Sundowner before the First Cease and Desist Order was issued, and the first order was limited in duration to only thirty days. Additionally, the Second Cease and Desist Order is limited in duration and will only remain in effect until the plaintiffs submit to a safety inspection of the range. This lends to the credibility of the Commission's safety concerns and against the plaintiffs' arguments of irrationality and arbitrariness. These arguments are properly made in a petition for a writ of certiorari or writ of prohibition, not as a substantive due process challenge.

I therefore **FIND** that the plaintiffs have not demonstrated likely success on the merits of their substantive due process claim.

IV.     **Conclusion**

Because the plaintiffs have not demonstrated a likelihood of success on the merits for any of their claims, the motion for preliminary injunction [Docket 2] is **DENIED**. The court

**DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          August 13, 2014

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE